UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

DR. WILLODENE ROBINS aka DENA KETCHAM-ROBINS,

                                                  Plaintiff,

-against-

NEW YORK CITY BOARD OF EDUCATION,

                                                  Defendant.

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

------------------------------------------------------------------x 07 Civ. 3599 (JGK)(KNF)

       Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, defendant, The New York City Board of Education (hereinafter, the "New York City Department of Education" or "DOE"), submits this Statement of Undisputed Material Facts as to which there are no genuine issues to be tried:

       1.       Plaintiff Willodene Robins (formerly known as Dena Ketcham-Robins) ("plaintiff"), a former[1] high school science teacher employed by the DOE, brings this action pursuant to Title VII of the of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), alleging that she has been subjected to unequal terms and conditions of employment due to her race and age. Specifically, plaintiff alleges that she was discriminated against in April 2005 when the school's Principal, Daniella Phillips ("Principal Phillips"), issued a letter to plaintiff's file concerning her failure to timely report a rape allegation by a female student. Plaintiff also alleges she was discriminated and retaliated against when she received to two unsatisfactory annual performance evaluations issued on or about June 28, 2005 and June

---

[1] Plaintiff retired from the DOE in July of 2008.

28, 2006 respectively. Plaintiff also asserts that she was retaliated against based on her criticism of her former Principal, Daniella Phillips and by allegedly being subjected to excessive scrutiny in the form of frequent classroom observations during the 2005-2006 school year.

### A.   Background

2. Plaintiff was born on July 12, 1953 and is African-American. See Exhibit "A" at pg. 3, No. 7; see also Exhibit "B" 7: at 20-21; 205: at 13.

3. Plaintiff holds a teaching license for Biology and General Science, Day High Schools. See Exhibit "B" 13: at 13-15.

4. Plaintiff began teaching with the New York City Department of Education in 1978. See Exhibit B" 18: at 10-16. Plaintiff started teaching at Brandeis High School and taught there for approximately fifteen years, although for three years plaintiff supervised an off-site Dropout Prevention Program. See Exhibit "B" 21: at 14-21.

5. At Brandeis High School, the assistant principal in charge of plaintiff's subject area (Science) was Ed Hayum. See Exhibit "B" 29: at 5-13. Mr. Hayum would conduct classroom observations of plaintiff. Plaintiff recalled that some of the observations were "Satisfactory" while some needed improvement. See Exhibit "B" 30: at 8-14.

6. Plaintiff testified that she believed that Mr. Hayum discriminated against her based on her race and gender. See Exhibit "B" 30: at 16-19; 31: at 17-19, 25:;32: at 1-2. Plaintiff believed that Mr. Hayum was discriminatory in his assignment of classes and concerning her teaching techniques. See Exhibit "B" 31: at 20-24.

7. Plaintiff filed a Charge of Discrimination against Mr. Hayum with the United States Equal Employment Opportunity Commission ("EEOC") sometime in the 1980s. See Exhibit "B" 31: at 6-15. The EEOC issued a No Probable Cause finding. See Exhibit "B" 32: at 6-8.

8. In September 1993, plaintiff transferred from Brandeis High School to Bronx High School of Science where she taught Bioethics and Biology until June 2000. See Exhibit "B" 43: at 9-11; 45: at 13-19; 46: at 7-8.

9. Thereafter, and in 2000, plaintiff accepted an assignment as an Interim Acting Assistant Principal of Science at Riverdale-Kingsbridge Academy ("RKA") which she held for the 2000-2001 school year. See Exhibit "B" 50: at 19-20; 52: at 2-7; 54: at 6-7; 62: at 18. RKA is a comprehensive middle and high school. See Exhibit "C" 9: at 22-25; 10: at 1-4.

10. Interim Acting positions with the DOE means that the individual does not permanently hold the position at issue. See Exhibit "B" 54: at 7-11. In fact, Chancellor's Regulation C-30, which governs the process and selection of DOE supervisors and administrators, including assistant principals, provides that interim-acting positions are temporary assignments. See Exhibit "D."

11. To permanently obtain such a supervisory position with the DOE the individual would have to go through what is called a C-30 process. See Exhibit "B" 54: at 13-16.

12. Plaintiff went through the C-30 process for the permanent Assistant Principal of Science position at RKA. See Exhibit "B" 54: at 17-19. The C-30 process provides that candidates for open assistant principal positions are interviewed and rated by a Level I committee, which consists, in part of educators, parents and staff. See Exhibit "D." Thereafter, candidates are selected to go on to appear before a Level II committee before a final hiring decision is made. Id.

13. Plaintiff was not appointed to the position and was told that she was not "proactive." See Exhibit "B" 56: at 5-12.

14. The assistant principal of science position was given to Daniella Philips. See Exhibit "B" 57: at 12-13.

15. Plaintiff reverted back to her teaching license and taught science at RKA. See Exhibit "B" 57: at 24-25; 59: at 10-13.

16. In 2002, Daniella Phillips became the Principal of RKA. See Exhibit "B" 62: at 1-6; see also Exhibit "C" 16 at 12-18.

17. For the 2002-2003 school year, plaintiff was on sabbatical and did not teach at RKA for that school year. See Exhibit "B" 62: at 22-25; 63: at 1-5.

18. Upon plaintiff's return from sabbatical in September 2003, the Assistant Principal of Science was Amanda Lurie. See Exhibit "B" 63: at 5-13.

19. Following Ms. Laurie, the Assistant Principal Science was Anthony Tamalonis. See Exhibit "B" 67: at 1-7.

20. Plaintiff believes that Mr. Tamalonis is Caucasian and at the time was in his fifties. See Exhibit "B" 67: at 22-25.

21. For the 2003-2004 school year Principal Phillips gave plaintiff a "Satisfactory" annual rating. See Exhibit "B" 68: at 1-5; see also Exhibit "E."

22. Plaintiff testified that she did not have any complaints concerning Principal Phillips during the 2003-2004 school year. See Exhibit "B" 68: at 6-8.

23. The first year that Mr. Tamalonis was the Assistant Principal of Science, he gave plaintiff satisfactory observation reports and plaintiff testified she did not have any complaints regarding him. See Exhibit "B" 68: at 9-20.

**B.   2004-2005 School Year – Plaintiff Fails To Report A Student Allegation Of Forcible Sex/Rape**

24. In a letter to her file dated April 14, 2005, Principal Daniella Phillips discussed a meeting with herself, plaintiff and plaintiff's union representative concerning an incident of an alleged student[2] rape on April 1, 2005 and plaintiff's failure to report her knowledge of the allegation in a timely manner. See Exhibit "F."

25. In particular, the April 14, 2005 letter noted that on April 1, 2005 a ninth grade female student alleged that she was forcibly removed from the school building by a tenth grade boy and raped by him in an adjacent park. The female student claimed that she told plaintiff about the rape on April 5, 2005 and plaintiff acknowledged during the April 14th meeting that she was informed on either April 5th of April 6th. When asked by Principal Phillips whether she notified anyone of the student's allegation, plaintiff stated that she tried several times to reach Dean Orozco-Rosario but the dean was absent until Thursday, April 7th. However, no messages were left in Ms. Orozco-Rosario's mailbox nor were any verbal messages left on her voicemail. When plaintiff was asked whether she made any efforts to notify anyone else, i.e., assistant principal, principal, guidance counselor, plaintiff responded that she had not and regretted not having done so. Id.

26. It was not until April 8, 2005, when Assistant Principal Amanda Lurie called plaintiff on the intercom phone about another student, that plaintiff reported the incident concerning the ninth grade female student.

27. Later that same day, the female student at issue returned to school at the end of the day with her parents and plaintiff saw the family in the main office. At this time, plaintiff reported to Principal Phillips that "this was really important and needed immediate attention." Id.

---

[2] Based on privacy considerations, all references to the name of the student have been redacted.

28. Principal Phillips recalled at her deposition that she first became aware of the student's April 1st rape allegation when the student and her parents came to the school on Friday, April 8th. See Exhibit "C" 20: at 18-25; 21: at 8-9; 22: at 3-25.

29. At that time, Principal Phillips reported that plaintiff asked to speak with her privately where plaintiff advised the principal that the student's parents were waiting for her and plaintiff told her some of the information surrounding the incident. See Exhibit "C" 22: at 23-25; 23: at 1-13.

30. Principal Phillips immediately met with the parents and when she learned of the student's allegations, contacted the police. See Exhibit "C" 24: at 4-25; 25: at 1-8.

31. During the April 14th meeting, Principal Philips gave plaintiff an article entitled "Principal Fired For Failing To Report Sex Assault Case" and reminded plaintiff that the school's teacher handbook and training addressed the mandate that DOE employees immediately report suspected student-to-student sexual harassment. It was noted that "[t]his incident may lead to disciplinary action, including an unsatisfactory rating and termination." See Exhibit "F."

32. Plaintiff testified that she was asked by the student "is it cheating if you really didn't want to go with a boy and you went with a boy." Plaintiff testified that she responded "well if you say no, then it's supposed to be no" and went on to describe what date rape was. See Exhibit "B" 73: at 3-5; 8-10.

33. Plaintiff testified that after speaking with the student she called Dean Orosco-Rosario but she was not there. See Exhibit "B" 74: at 19-21.

34. Plaintiff did not speak to anyone else concerning the incident. See Exhibit "B" 76: at 17-19. Plaintiff claims that she tried to call Dean Rosario the next day but was unable to reach her. See Exhibit "B" 80: at 10-16. Two days after speaking to the female student, a

male student asked plaintiff about the student, which plaintiff refused to discuss. See Exhibit "B" 82: at 4-10. Fearing for the safety of the female student, unsure whether the male student would harm her for allegedly cheating on him, plaintiff called Assistant Principal Lurie and expressed her concerns over the safety of the female student given the inquiry made by the male student. See Exhibit "B" 82: at 9-12; 83: at 15-25; 84: at 1-4, 11-25; 85: at 1-2. Later that day, plaintiff saw the student at the school with her parents. See Exhibit "B" 85: at 23-25. Plaintiff told Principal Phillips that whatever the students were going to speak to her about was "important." See Exhibit "B" 88: at 1-5.

35. Plaintiff filed a grievance of the April 14, 2005 letter to her file, claiming that it was "inaccurate" and sought the removal of the letter from her file. See Exhibit "G." A Step I Grievance hearing was held on June 20, 2005. See Exhibit "H." The Grievance Decision by Principal Phillips recounted that plaintiff claimed that the inaccuracies of the April 14th letter was that she notified Amanda Lurie on April 8, 2005 of the alleged rape and plaintiff disagreed with the description of the incident as an alleged rape, because plaintiff felt that the student's only concern was her potential pregnancy. Principal Phillips investigated plaintiff's claims of inaccuracy and found them to be unfounded. Principal Phillips explained that Ms. Lurie initiated contact with plaintiff on April 8th and whether the student used the word "rape" or merely described "say(ing) no to a boy and he still does it," it remained plaintiff's professional responsibility to immediately report all claims or allegations of rape. Accordingly, plaintiff's grievance was denied. Id.

36. For the 2004-2005 school year, plaintiff received an overall "Unsatisfactory" rating on her Annual Professional Performance and Report. See Exhibit "I." In particular, plaintiff was found "unsatisfactory" in the areas of attention to pupil health, safety and

general welfare and attention to records and reports. Principal Phillips noted that "[i]t is essential that any knowledge of alleged or suspected abuse, rape or criminal activity be reported to appropriate school personnel in a timely and thorough manner."

37. Plaintiff appealed her annual "Unsatisfactory" ratting for the 2004-2005 school year. See Exhibit "J." Plaintiff's appeal was denied and the "Unsatisfactory" rating was sustained as a "consequence of failing to protect the safety and welfare of a student by not reporting a serious matter in a timely manner."

38. Plaintiff testified that she believed that her 2004-2005 annual rating was discriminatory because it was based on one incident. See Exhibit "B" 119: at 5-21.

39. For the 2004-2005 school year, plaintiff complained about discrimination because "we had to lobby to get African-American history month in the school" and had to get permission to do it at the school every year." See Exhibit "B" 120: at 1-10.

40. Plaintiff complained that "it seemed like it was a problem" for her to attend a certain workshop but acknowledged that ultimately Principal Phillips allowed her to attend. See Exhibit "B" 122: at 5-25; 123: at 1.

41. Plaintiff testified that Principal Phillips would target her, coming into her classroom, speak to her in a "very nasty, negative" way. See Exhibit "B" 123: at 12-22; 124: at 7-11.

42. Plaintiff testified that Principal Phillips did not care for her because she believed that Principal Phillips did not want her to stay at the school after she did not get the assistant principal position and did not want her to teach high school science. See Exhibit "B" 124: at 12-25; 125: at 1-19.

43. When asked why plaintiff attributed such beliefs to Principal Phillips, plaintiff testified that "well, just they way she behaved, you know, you could see - - feel the antagonism." See Exhibit "B" 125: at 23-25; 126: at 1.

44. Plaintiff complained about the amount of time it took her dissertation proposal to be signed off on by several DOE employees including Principal Phillips. In particular, plaintiff complained that she gave Principal Phillips the form around May 23, 2005 but on June 2, 2005, she got the form back and learned that she has to contact a certain individual and get some "special paperwork." See Exhibit "B" 128: at 2-19; 129: at 1-25; 130: at 1.

45. Plaintiff testified that she did not receive the form back until June 10th, signed off by three individuals, including Principal Phillips. See Exhibit "B" 129: at 18-25; 130: at 1, 19-23.

46. Further, plaintiff complained that in the 2004-2005 school year, Principal Phillips and a DOE superintendent, Kathleen Pollina denied plaintiff's request for a second sabbatical stating that it would have been a hardship for the school. See Exhibit "B" 131: at 4-10; 133: at 14-20. Plaintiff believed that Ms. Pollina was over forty in age and was Caucasian. See Exhibit "B" 131: at 11-25.

C.  **2005-2006 School Year – Plaintiff Exhibits Unsatisfactory Classroom Performance And Has Two Incidents Of Laptops Thefts In Her Classroom**

47. On November 30, 2005, Assistant Principal, Anthony Tamalonis conducted an observation of plaintiff's Period 5 Living Environment Class. See Exhibit "K." The lesson was found to be "Unsatisfactory."

48. Assistant Principal Tamalonis noted in his observation that plaintiff did not achieve the Aim of the lesson, the rigor of the lesson was extremely low as the material covered was at the middle school life science level, plaintiff asked the students very few questions and those she did ask were recall questions. Plaintiff failed to conduct a discussion that was indicated in her lesson plan, paid little attention to classroom management as students talked to each other throughout most of the period and plaintiff made brief and weak comments in attempts to restore order to the class. Id.

49. Plaintiff's lack of clear instructions contributed to confusion and poor tone in the classroom, plaintiff failed to correct a situation in which students could not read the information on the board, thus students disengaged from the lesson and focused on each other. Plaintiff left notes from an unrelated lesson on the board, confusing some students, the students spent too much time searching, drawing, and waiting for others in their group to finish work and there was little, if any, accountable talk within the group. The information researched by the students was not paraphrased or discussed, plaintiff failed to provide the students with a clear expectation as to what she wanted produced nor any clear criteria chart or rubric for self-assessment despite previous meetings earlier in the year where the importance of students having a clear understanding of what is expected and the importance of a posted rubric or criteria chart was discussed. Id.

50. Plaintiff complained that for the 2005-2006 school year that Mr. Tamalonis came "gunning" for her and was in her classroom constantly. See Exhibit "B" 116: at 16-25.

51. In a letter to plaintiff's file dated, December 15, 2005, Principal Phillips described the circumstances surrounding a December 9, 2005 meeting with Principal Phillips,

plaintiff and plaintiff's union representative. See Exhibit "L." The meeting concerned two incidents of theft of laptop computers that week in plaintiff's classroom and plaintiff's failure to secure a cart of laptop computers for several weeks.

52. The letter noted that on Friday, December 2, 2005 plaintiff reportedly locked a laptop computer and LCD projector on her teacher's closet at the end of the day. However, when she returned to school on Monday, December 5, 2005, plaintiff unlocked the closet and saw the laptop computer was missing but that the LCD projector was still there. There were no signs of forced entry. The police were called. Id.

53. The letter further noted that later in the afternoon of December 5, 2005, plaintiff locked thirty-five laptop computers into the laptop cart and locked the cart and his the key to the laptop cart in her classroom. Plaintiff failed to lock the key to the laptop cart in a secure location. The next day on December 6, 2005, plaintiff could not find the hidden key and when the laptop cart was eventually unlocked, it was discovered that nine laptop computers totaling $11,610 were missing. A Police Complaint was filed. See Exhibit "M."

54. Plaintiff indicated to Principal Phillips that for the past several weeks, instead of giving the laptop cart key to the technology aide, she hid the key inside her classroom in an unlocked drawer. Id.

55. At the December 9, 2005 meeting, plaintiff was reminded that the teacher handbook and training addressed the importance of securing A/V equipment and laptop computers and the protocol for doing so. See Exhibit "L."; see also Exhibit "N."

56. Additionally, it was noted that plaintiff's security awareness should have been heightened by the December 5th stolen laptop incident and such thefts came after a June 15, 2005 meeting concerning a stolen laptop computer in plaintiff's classroom last school year and

Principal Philips observation of poor classroom supervision of student's use of computers. Given three separate incidents of theft of laptop computers in plaintiff's classroom, plaintiff's use of laptop computers was indefinitely suspended. See Exhibit "L."

57. On April 6, 2006, a meeting with Principal Phillips, plaintiff and plaintiff's union representative took place. See Exhibit "O." The purpose of the meeting was to discuss Principal Phillips' concerns from the informal observation of plaintiff's Bioethics class on April 4, 2006.

58. On April 4, 2006, Principal Phillips observed that no students had paper, notebook or a journal on his/her desk. Plaintiff was showing a movie entitled "John Q." At the meeting, Principal Phillips asked to see plaintiff's lesson plan for that date and found it to be "unacceptable by any standard," listing only a vague series of steps.

59. Principal Phillips noted that plaintiff was reminded that the school handbook and training addressed the importance of showing "G" rated videos with a clear instructional focus, in short excerpts, with a written hand-out to help focus students' viewing and with prior supervisory approval. The movie had not been discussed with plaintiff's supervisor and contained substantial profanity and mob violence. Plaintiff's response was that she "didn't remember all that profanity" and that the only time she saw the movie was four years ago. Principal Phillips expressed her concern that plaintiff would think to show a movie without previewing the content to familiarize herself with it, and. possibly skip over certain scenes that sent inappropriate messaged to adolescents. Id.

60. On May 9, 2006, Principal Phillips conducted a classroom observation of plaintiff's 9th Grade Living Environment Class. See Exhibit "P." The lesson was found to be "Unsatisfactory."

61. Plaintiff was commended for using varied instructional tools, for incorporating instructional technology into her lesson and for having an easy rapport with students. However, the observation report also noted that most of the questions plaintiff asked and activities that she assigned were low level, which often led to one word answers and rote copying for students. Student participation lessened as the lesson developed. Only half the class underlined or highlighted important points as instructed. Students were not guided in the expected content and discussions became off-topic and sensationalized. Higher level questions was said to help sustain student engagement in the lesson. A few students dominated and sometimes disrupted the lesson and distracted plaintiff from attending to many other students. Although plaintiff claimed that two students refused to sit in their assigned seats, several members of plaintiff's class told Principal Phillips that they never had assigned seats. The observation also noted that plaintiff's classroom was messy and lacked current student work. Id.

62. Principal Philips was very concerned by the lack of academic rigor in the lesson. At the pre-observation conference, it was discussed that 60% of plaintiff's students from the year prior (21 our of 30 in the class) passed the 2005 Living Environment Regents, yet 100 % of them (34 students in total) passed plaintiff's class. This disconnect needed to inform plaintiff's instruction and academic expectations so that students are better prepared to succeed at Regents-level work. Id.

63. For the 2005-2006 school year, plaintiff received an overall "Unsatisfactory" rating on her Annual Professional Performance and Report. See Exhibit "Q." In particular, plaintiff was found "unsatisfactory" in the areas of: planning and preparation of work; effective use of appropriate methods and techniques; evidence of pupil growth in knowledge, skills, appreciations and attitude; attention to physical conditions; housekeeping and

appearance of room; care of equipment by teacher and children and attention to records and reports.

64. Principal Phillips noted that [t]here are serious concerns about Ms. Robins' planning and delivery of rigorous instruction. In addition, her inattention to physical conditions, procedures and care of equipment is problematic." Id.

65. Plaintiff appealed her annual "Unsatisfactory" rating for the 2005-2006 school year. See Exhibit "R." Plaintiff's appeal was denied and the "Unsatisfactory" rating was sustained as a "consequence of failure to adhere to security protocols and insufficient growth as a teacher in spite of a plethora of assistance that was provided." Id.

66. After the 2005-2006 school year, plaintiff accepted a teaching position at DOE's Bronx Technical High School, which she started in September 2006 and stayed for one year. See Exhibit "B" 177: at 9-18; 178: at 1-5. Thereafter, plaintiff left top be the Data Specialist at DOE's Public School ("P.S.") 129. See Exhibit "B" 178: at 7-10.

67. Plaintiff held this position for one school year, from September 2007 to June 2008 and decided to retire from the DOE on July 12, 2008. See Exhibit "B" See Exhibit "B" 13: at 4-5; 179: at 3-7. When asked why she decided to retire, plaintiff responded "I had the time, the age.' See Exhibit "B" 179: at 8-9.

**D.   Plaintiff's Charge Of Discrimination With The United States Equal Employment Opportunity Commission**

68. On or about November 6, 2006, plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). See Exhibit "B" 177: at 5-8; see also Exhibit "S."

69. Plaintiff alleged race and age discrimination as well as retaliation. Id.

70. Plaintiff believes that she was retaliated against for verbally stating to colleagues and in department meetings that Principal Phillips should have been fired for how she handled the school's opening in 2005. See Exhibit "B" 183: at 24-25; 184: at 1-25.

71. Plaintiff believed that her complaining got back to Principal Phillips, although no one told plaintiff that they told Principal Phillips what she said, nor did Principal Phillips ever indicate that she heard about what plaintiff said. See Exhibit "B" 186: at 1-16.

72. Plaintiff also complained of DOE supervisors coming into her classroom and her observation reports. See Exhibit "B" 186: at 21-24.

73. Plaintiff testified that Mr. Tamalonis made discriminatory statements about her race when he said that he wanted her to be a role model for the kids and plaintiff believed that to her the word "rigor" was code word for "nigger." See Exhibit "B" 203: at 22-25; 204: at 11-12.

74. Plaintiff could not recall any statement being made concerning her age. See Exhibit "B" 208: at 10-15.

75. The EEOC issued a Notice of Right to Sue to plaintiff, dated March 2, 2007. See Exhibit "T." The EEOC's review failed to indicate that a violation had occurred and it was unlikely that additional investigation would result in a finding of a violation. There was no evidence that the negative treatment plaintiff complained of occurred as a result of her age or race.

E. **Plaintiff's Instant Federal Lawsuit**

76. On or about May 4, 2007, plaintiff commenced the instant federal lawsuit which alleges race and age discrimination pursuant to Title VII and the ADEA.

Dated: New York, New York
       October 26, 2009

                              MICHAEL A. CARDOZO

- 15 -

>                       Corporation Counsel of the
>                        City of New York
>                       Attorney for Defendants
>                       100 Church Street
>                       New York, New York 10007
>                       (212) 788-8685
>                       cbarnett@law.nyc.gov
>
>                       By: _____
>                           Camille D. Barnett
>                           Assistant Corporation Counsel